IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

ESTATE OF KELLY ALLEN,         )
Deceased, CLAYTON DAVID ALLEN, )
MARIA NICOLE ALLEN, a minor by )
Next Friend, Kenneth Allen,    )
ALEXIS LANE ALLEN, a minor by  )
Next Friend, Kenneth B. Allen, )
                             )
     Plaintiffs            )
                             )
v.                            )
                             )
CITY OF WEST MEMPHIS, et al.,  )
                             )             Nos. 05-2489,
     Defendants/Third Party    )                  05-2585
     Plaintiffs            )
                             )
v.                            )
                             )
ESTATE OF DONALD RICKARD,     )
deceased, through its        )
Administrator SCOTT B.       )
PEATROSS,               )
                             )
*Consolidated with*        )
                             )
WHITNE RICKARD, a minor child, )
Individually, and as Surviving )
Daughter of Donald Rickard,   )
Deceased, by and through her  )
mother SAMANTHA RICKARD, As   )
parent and next friend,     )
                             )
     Plaintiff            )
                             )
v.                            )
                             )
CITY OF WEST MEMPHIS, et al.,  )
                             )
     Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTION TO DISMISS**

Before the Court is Defendants Mayor William H. Johnson, Chief Robert Paudert, and West Memphis Police Officers Tony Galtelli, John Gardner, Lance Ellis, Jimmy Evans, Joseph Forthman, and Vance Plumhoff's (collectively the "Separate Defendants") November 30, 2009 Motion for Summary Judgment.[1] Each of the Plaintiffs[2] makes numerous claims against the Separate Defendants, alleging, inter alia, excessive force claims in violation of the Fourth and Fourteenth Amendments; violations of the Fifth and Sixth Amendments; tort claims arising under the laws of Arkansas or Tennessee, including assault and battery, malicious harassment, intentional infliction of emotional distress, false imprisonment, false arrest, and abuse of process; and violations of the Tennessee Constitution.

The Separate Defendants maintain that actions taken by the West Memphis Police Officers were reasonable given the circumstances existing at the time of the incidents alleged and,

---

[1] Although the Separate Defendants style their Motion as a Motion for Summary Judgment, they seek dismissal of some of the claims brought against them. The Court will address each of the claims separately and note whether the Separate Defendants seek summary judgment or dismissal of each claim.

[2] Estate of Kelly Allen, et al. v. City of West Memphis, No. 05-2489 was consolidated with Whitne Rickard v. City of West Memphis, No. 05-2585 on September 24, 2009.

thus, that their actions did not violate the Plaintiffs' constitutional rights; that the officers are entitled to qualified immunity for their actions; that the Separate Defendants are entitled to summary judgment based on privileges and/or statutory immunity; and that the claims against Mayor Johnson[3] and Chief Paudert should be dismissed.

Plaintiffs Alexis Lane Allen, Clayton David Allen, Maria Nicole Allen, and the Estate of Kelly A. Allen (collectively the "Allen Plaintiffs") filed a response to the Separate Defendants' Motion for Summary Judgment on January 25, 2010. Also on January 25, 2010, Plaintiff Whitne Rickard (the "Rickard Plaintiff") filed a response to the Separate Defendants' Motion for Summary Judgment.[4] The Separate Defendants filed a Reply to the Allen Plaintiffs and the Rickard Plaintiff's responses on February 8, 2010. For the following reasons, the Separate Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## I.   Background

The following facts are undisputed unless otherwise stated. The incidents giving rise to this lawsuit occurred around

---

[3] In their Reply, the Separate Defendants include a reference to the claims against Mayor Johnson in their discussion of the claims against Chief Paudert. (Defs.' Reply 10.) However, the Separate Defendants also assert that Mayor Johnson is not sued in his personal capacity, as the other individual Defendants are. (Defs.' Memo 7.) Therefore, the claims against Mayor Johnson should be considered tantamount to the claims against the City and not against him personally, and, thus, are not within the scope of the pending Motion. See Moore v. City of Harriman, 272 F.3d 769, 772 (6th Cir. 2001).

[4] "Plaintiffs" will refer to both the Allen Plaintiffs and the Rickard Plaintiff.

midnight on July 18, 2004, when West Memphis Police Officer Joseph Forthman initiated the traffic stop of a white Honda Accord (the "Rickard vehicle") in West Memphis, Arkansas. (Rickard Plaintiff's Response to Defendants' Statement of Facts, Dkt. 61, Exh. 5 ¶ 1.) ("Pl.'s SOF") Forthman was driving patrol unit # 279, which had a video camera that recorded the events from the initial traffic stop through the entire sequence of events. (Defendants' Statement of Facts, Dkt. 59, Exh. 2 ¶ 6.) ("Defs.' SOF") Donald Rickard was the driver of the Rickard vehicle and Kelly Allen was a passenger. Forthman stopped the vehicle because of an inoperable headlight. (Id. ¶ 2.)

Forthman approached the vehicle and asked the driver, Rickard, for his license and registration. (Id. ¶ 13.) As he approached the Rickard vehicle, Forthman noticed an indentation, "roughly the size of a head or a basketball," in the windshield. (Id. ¶ 14.) Forthman asked Rickard what was wrong with the windshield, and the passenger, Allen, answered that the car had hit a curb, causing damage to the windshield. (Id. ¶¶ 16-17.) Forthman then glanced into the car and asked, "You haven't had any Keystone tonight have you?"; Rickard replied that he had not. (Id. ¶¶ 19-20.) After waiting for Rickard to produce his driver's license, Forthman asked Rickard to step out of the vehicle, "[b]ecause he was so nervous and he went over his I.D. card or driver's license several times without producing it to

4

me." (Id. ¶¶ 24, 26.) Forthman states that he then asked Rickard twice to step out of the vehicle before the vehicle sped away. (Id. ¶ 28.)

Forthman returned to his vehicle and informed dispatch that he had a "runner," meaning someone fleeing the scene of a traffic stop. (Id. ¶ 29.) Officer Vance Plumhoff was close to the location where Forthman had stopped Rickard and heard that Forthman had a runner. (Id. ¶ 32.) Plumhoff quickly became involved in the pursuit and became "primary," meaning the lead vehicle in the chase. (Id. ¶ 33.) Plumhoff was driving patrol unit # 290, which did not have a video camera. (Id. ¶ 31.) Officer Jimmy Evans saw the Rickard vehicle, being pursued by two police vehicles, turn onto the Interstate 40 ("I-40") ramp heading east toward Memphis, Tennessee, and joined the pursuit. (Id. ¶ 34.) Evans was driving patrol unit # 205, which was not equipped with a video camera. (Id. ¶ 35.) Officer Lance Ellis was in route to aid Forthman in his stop, when he learned of the pursuit and joined the other officers in the pursuit. (Id. ¶ 36.) Ellis was driving unit # 284, which was equipped with a video camera that was able to record some of the events at issue in this suit. (Id. ¶ 37.) Officers Troy Galtelli and John Gardner also joined the pursuit after finishing a traffic stop. (Id. ¶¶ 38-41.) Galtelli was driving unit # 286, which was equipped with a camera that was able to record some of the

events; Gardner was driving unit # 287, which was equipped with a video camera that was nonoperational. (Id. ¶¶ 39, 41.)

Forthman, Plumhoff, Evans, Ellis, Galtelli, and Gardner pursued the Rickard vehicle as it headed east on I-40 toward Memphis. Forthman said over the radio, "we got enough [meaning vehicles to perform a rolling roadblock] lets shut him down before he gets to Memphis." (Id. ¶ 42 (alteration in original).) Evans then got in front of the Rickard vehicle to perform a rolling roadblock. (Id. ¶ 47.) As Evans was getting in front of the vehicle, Plumhoff said on the radio, "he just tried to ram me." (Id.) Although it is undisputed that Plumhoff made such a statement, the alleged attempted ramming is not clearly demonstrated on the video of unit # 279, which was behind Plumhoff and Rickard, and Plaintiffs dispute whether such an attempt was made. (Pl.'s SOF ¶ 47.) After nearing Plumhoff's car on the right side of the road, the Rickard vehicle moved left. Forthman can be heard on the radio saying, "he is trying to ram another car." (Defs.' SOF ¶ 54.) Plaintiffs again do not challenge that Forthman made such a statement, but assert that the stated activity is not clearly depicted on the video and dispute whether such an attempt was made. (Pl.'s SOF ¶ 54.)

After the officers' assertions that the Rickard vehicle had attempted to ram Plumhoff and then Evans, Forthman said over the

6

radio, "[w]e do have aggravated assault charges on him West Memphis advise Memphis that we do have felony charges." (Defs.' SOF ¶ 62.)  Whether there were in fact felony charges at this point is disputed.  (Pl.'s SOF ¶ 62.)  As the pursuit continued over the I-40 bridge spanning the Mississippi River, Plumhoff can be heard saying that Rickard had another count of aggravated assault.  (Defs.' SOF ¶ 64.)  That activity is not clearly depicted on the video and is disputed.  (Pl.'s SOF ¶ 64.)

Once in Memphis, Tennessee, the Rickard vehicle turned and exited I-40 onto Danny Thomas Boulevard.  (Defs.' SOF ¶ 69.) The pursuit was momentarily on Alabama Avenue before the Rickard vehicle turned right onto Danny Thomas Boulevard.  (Id. ¶ 71.) At that point, Plumhoff made a statement on the radio about ending the pursuit.  Evans replied, "terminate the pursuit?" Another voice can then be heard on the radio saying, "negative. See if you can get in front of him."  (Id. ¶ 72.)  As the Rickard vehicle approached Jackson Avenue, it made a quick right turn onto Jackson Avenue and contact occurred between the Rickard vehicle and a police vehicle.  (Id. ¶ 76.)  The contact caused the Rickard vehicle to spin around in a parking lot at the intersection of Danny Thomas Boulevard and Jackson Avenue. (Id. ¶ 77.)  Separate Defendants assert that the Rickard vehicle then turned directly toward Plumhoff's vehicle and had a head-on collision with it.  (Id. ¶¶ 83-85.)  Plaintiffs dispute these

statements and aver that the Rickard vehicle was still moving forward from the momentum caused by the spinout after contact with Evans' vehicle and that this momentum caused the collision with Plumhoff's vehicle. (Pl.'s SOF ¶ 86.)

At or near this stage of events, the other officers formed a semicircle around the Rickard vehicle, attempting to use the building in the parking lot to prevent the vehicle from fleeing. (Defs.' SOF ¶ 90.) Because of the building and the location of the police cars, the only unobstructed way for Rickard to escape was to back up. (Id. ¶ 93.) Rickard reversed in an attempt to escape, and as he did so Evans and Plumhoff exited their vehicles and approached the Rickard vehicle. (Id. ¶¶ 94-95.) Evans tried to get into the vehicle by pounding on the passenger-side window with his gun in his hand. (Id. ¶ 97.) Gardner and other officers also approached the vehicle. (Id. ¶¶ 98, 100.) At this point, the wheels of the Rickard vehicle were spinning, and the vehicle made contact with Gardner's vehicle. (Pl.'s SOF ¶ 101.) Separate Defendants assert that the vehicle's engine was "revving," but Plaintiffs dispute this and state that the vehicle was rocking back and forth, and it is unclear whether the engine noise in conjunction with this rocking motion should be characterized as revving the engine. (Id. ¶ 102.)

8

Plumhoff fired three shots into the Rickard vehicle. (Defs.' SOF ¶ 103.)  The video from unit # 279 shows that Plumhoff was near the passenger-side of the vehicle when he fired those shots.  (Videotape of Unit # 279, at 11:14:24.)  The Rickard vehicle then reversed in a 180 degree arc onto Jackson Avenue heading east.  (Defs.' SOF ¶ 108.)  As the Rickard vehicle reversed, Galtelli exited his vehicle and ran to join the other officers who were chasing the vehicle as it maneuvered onto Jackson Avenue.  (Id. ¶ 110.)  Ellis was standing near the rear passenger-side of Rickard's vehicle and had to step to his right to avoid the vehicle.  (Pl.'s SOF ¶ 111.)  Gardner then fired ten shots toward the vehicle, initially from the passenger side and then from the back of the vehicle.  (Id. ¶ 114.) Gardner fired all ten shots while the vehicle was moving forward (i.e., away from the officers).  (Deposition of Forthman, Dkt. No. 61, Exh. 1, at 158.)  Galtelli also fired two shots at the vehicle.  (Pl.'s SOF ¶ 116.)  As the officers were shooting, Rickard was fleeing down Jackson Avenue.  (Defs.' SOF ¶ 118.) Rickard then lost control of the vehicle, and the Rickard vehicle crashed into a building at the corner of Jackson Avenue and Manassas Street.  (Id. ¶ 121.)  Both Rickard and Allen were killed.  The events between the time Rickard collided with Evans and spun out and the time Rickard fled down Jackson Avenue occurred within a matter of seconds.  (Id. ¶ 120.)

**II.   Jurisdiction and Choice of Law**

This Court has original jurisdiction to adjudicate federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

Plaintiffs' Complaint alleges various common law torts under Tennessee and/or Arkansas law.  Separate Defendants assert that Arkansas law should be applied, and Plaintiffs assert that Tennessee law should be applied.  (Defendants' Memorandum of Law in Support of Motion for Summary Judgment 26-29 ("Defs.' Memo"); Allen Plaintiffs' Memorandum in Response to Defendants' Motion for Summary Judgment 14-15 ("Allen Pls.' Resp."); Rickard Plaintiff's Memorandum in Response to Defendants' Motion for Summary Judgment 34 ("Rickard Pl.'s Resp.").)  In a diversity case, a federal court applies the choice-of-law rules of the state in which it sits.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Therefore, the Court will apply Tennessee choice-of-law rules.

In Hataway v. McKinley, the Supreme Court of Tennessee adopted the "most significant relationship" approach to resolve conflict-of-law issues in tort cases.  830 S.W.2d 53, 54 (Tenn. 1992).  That approach is stated in the Restatement (Second) of Conflict of Laws, which provides that the law of the state where the injury occurred should be applied unless another state has a more significant relationship to the action.  Id. at 59-60.  The

following factors from Restatement (Second) § 6 provide guidance in determining which state has the most significant relationship:

    (a)  The needs of the interstate and international systems,
    (b)  The relevant policies of the forum,
    (c)  the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d)  the protection of justified expectations,
    (e)  the basic policies underlying the particular field of law,
    (f)  certainty, predictability, and uniformity of result, and
    (g)  ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2). The court noted that a benefit of adopting this approach is its ease of application "in difficult cases because it provides a 'default' rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation." Hataway, 830 S.W.2d at 59.

Separate Defendants argue that Arkansas law should be applied because the relationship between decedents and Separate Defendants was centered in West Memphis, Arkansas; all Separate Defendants were at all relevant times employees of an Arkansas municipality; and, but for Rickard's fleeing into Tennessee, the Defendant officers would never have entered Tennessee. (Defs.' Memo 27-28.) Plaintiffs argue that Tennessee law should apply because, although the chase began in Arkansas, it continued well

11

into Tennessee; the spinout and vehicle contact occurred in Tennessee; the shootings and final vehicle crash occurred in Tennessee; the injuries occurred in Tennessee; and decedents were residents of Tennessee. (Allen Pls.' Resp. 15.)

Most of the material matters in dispute occurred in Tennessee. The interaction between the parties that resulted in the injuries and the alleged tortious behavior took place solely in Tennessee. Because the alleged tortious conduct and the injuries giving rise to this suit occurred in Tennessee, no state has a more significant relationship to this action than Tennessee. See Hataway, 830 S.W.2d at 59 (directing courts to apply the law of the place where the injury occurred even if another state has an almost equally significant relationship to the matter at issue). Therefore, the Court will apply Tennessee substantive law to Plaintiffs' state law claims. Id. at 54.

### III. Standard of Review

#### A. Motion for Summary Judgment Pursuant to Rule 56

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences

12

drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts establishing that there is a genuine issue for trial by showing that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 247-48.

When confronted with a properly-supported motion for summary judgment, the nonmoving party may not oppose it by mere reliance on the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989) (citations omitted). The district court does not have a duty to search the record for this evidence; rather, the nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in her favor. InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

13

## B. Motion to Dismiss Pursuant to Rule 12(b)(6)

In addressing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007). A plaintiff can support a claim "by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563 (2007). This standard requires more than bare assertions of legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Any claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (citing Twombly, 550 U.S. at 555.) Nonetheless, a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face" to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

14

possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). To survive a motion to dismiss, a complaint ultimately must demonstrate "facial plausibility," defined as "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted).

### IV. Analysis

#### A. Qualified Immunity

The Separate Defendants assert that they are entitled to summary judgment on qualified immunity because their actions did not violate the constitutional rights of Donald Rickard or Kelly Allen and, even if a constitutional violation occurred, that violation was not of a clearly established right. (Defs.' Memo 7.)

Qualified immunity exists so that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity also protects law enforcement officers "from the sometimes hazy border between excessive and acceptable force." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (citation and internal quotation marks omitted).

"Qualified immunity is <u>an immunity from suit</u> rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial." <u>Marvin v. City of Taylor</u>, 509 F.3d 234, 243 (6th Cir. 2007) (citation and internal quotation marks omitted; emphasis in original). The Sixth Circuit presumes that qualified immunity ordinarily applies. <u>See</u> <u>Chappell v. City of Cleveland</u>, 585 F.3d 901, 907 (6th Cir. 2009). Thus, the burden is on the Plaintiffs to show that the Separate Defendants are not entitled to qualified immunity. <u>Id.</u>

The qualified immunity analysis requires the Court to answer a threshold question: "Taken in t.he light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Marvin</u>, 509 F.3d at 244 (internal quotation marks and citations omitted); <u>accord</u> <u>Dunn v. Matatall</u>, 549 F.3d 348, 353 (6th Cir. 2008) (also raising question when reviewing qualified immunity at summary judgment stage). If the Court answers that question in the affirmative, the Court must decide "whether the right was clearly established . . . in light of the specific context of the case." <u>Marvin</u>, 509 F.3d at 244 (internal quotation marks and citation omitted; omission in original). "In other words, qualified immunity need only be granted if there is a violation of a constitutional right, but that right was not clearly

established at the time the official violated it." <u>Id.</u> If there is no constitutional violation, the claim fails as a matter of law, and no immunity is necessary. <u>Id.</u>

## 1. Rickard Plaintiff

Section 1983 itself does not create substantive rights, but provides "a method for vindicating federal rights elsewhere conferred." <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989) (citation and internal quotation marks omitted). The first step in addressing § 1983 excessive force claims is to identify the constitutional rights allegedly violated by the asserted application of force. <u>Id.</u> The Rickard Plaintiff alleges violations of rights secured by the Fourth and Fourteenth Amendments.

## a. Constitutional Violation

Excessive force claims resulting from an investigatory stop are subject to the protections of the Fourth Amendment. <u>Graham</u>, 490 U.S. at 394; <u>see</u> <u>also</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.") In <u>Graham</u>, the Supreme Court made clear that "<u>all</u> claims that law enforcement officers have used excessive force-deadly or not-in the course of an . . . . investigatory stop . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a

'substantive due process' approach." <u>Graham</u>, 490 U.S. at 395 (emphasis in original). The Rickard Plaintiff's constitutional claims brought pursuant to § 1983 must be analyzed under the Fourth Amendment's reasonableness standard.

The reasonableness standard asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397 (citations omitted). In analyzing the officers' actions, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." <u>Garner</u>, 471 U.S. at 8 (citations omitted). That balancing is the "key principle of the Fourth Amendment," <u>id.</u> (citation omitted), and "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." <u>Marvin</u>, 509 F.3d at 245 (citation omitted).

Factors to consider in determining whether an officer's actions are objectively reasonable are: the facts and circumstances of the case; the severity of the crime at issue in the case; the immediate threat that the suspect poses to the officers or others; and whether the suspect is actively resisting or evading arrest by flight. <u>See</u> <u>id.</u> (citation

18

omitted).   Reasonableness must be analyzed from the perspective
of an officer on the scene, as opposed to the "20/20 vision of
hindsight."   Williams v. City of Grosse Pointe Park, 496 F.3d
482, 486 (6th Cir. 2007) (quoting Graham, 490 U.S. at 396).
That means the analysis "must embody allowance for the fact that
police officers are often forced to make split second judgments-
in circumstances that are tense, uncertain, and rapidly
evolving-about the amount of force that is necessary in a
particular situation."   Id. (citation omitted).   "[T]he test of
reasonableness under the Fourth Amendment is not capable of
precise definition or mechanical application, however, its
proper application requires careful attention to the facts and
circumstances of each particular case . . . ."   Graham, 490 U.S.
at 396 (citation and internal quotation marks omitted).

     In Tennessee v. Garner, the Supreme Court analyzed a Fourth
Amendment seizure resulting in death and considered whether the
totality of the circumstances justified the officer's actions.
See Garner, 471 U.S. at 4, 9.   In balancing the interests, the
Court noted that "[t]he intrusiveness of a seizure by means of
deadly force is unmatched," and that deadly force frustrates
both the interests of the individual and society in judicial
determination of guilt and punishment.   Id. at 9.   Against those
interests, the Court weighed the government's interest in
effective law enforcement, noting that "[b]eing able to arrest

19

[fleeing suspects] is a condition precedent to the state's entire system of law enforcement." Id. at 10. Nevertheless, the Court was "not convinced that the use of deadly force is a sufficiently productive means of accomplishing [the government's goals] to justify the killing of nonviolent suspects." Id. (citation omitted). The Court noted that deadly force is a "self-defeating way of apprehending a suspect," id., and found that, where the suspect poses no immediate threat to the officers present or to others, the harm from failing to apprehend him is less than the harm from using deadly force: "It is not better that all felony suspects die than that they escape." Id. at 11. The Court noted, however, that there are times when deadly force is not constitutionally unreasonable. See id. Where the suspect threatens an officer with a weapon or where there is probable cause to believe the suspect has inflicted or threatened to inflict serious physical harm, and where, if possible, the officers give some warning, deadly force may be used. See id. at 11-12.

The Separate Defendants assert that the officers' actions were objectively reasonable. Therefore, there is no constitutional violation. The undisputed facts do not support that assertion. The first shots were fired from the side of the Rickard vehicle. Although Plumhoff testified that he thought he was in front of the vehicle, the video shows that he was to the

side of the vehicle and in no danger of being hit by the vehicle. (Videotape of Unit # 279, at 11:14:24.) The remaining 12 shots were fired as the vehicle was passing or had passed the officers. (Pl.'s SOF ¶¶ 114, 116.) None of the officers on the scene believed that either Rickard or Allen was armed; the suspects were initially stopped because of an inoperable headlight; and the suspects were driving away from officers when the shots were fired. Thus, the severity of the crime at issue was low, and the suspects posed little immediate threat to the officers or others. Although the suspects were fleeing arrest, that factor alone is insufficient to support a finding that deadly force was objectively reasonable. See Garner, 471 U.S. at 11.

The Separate Defendants argue that, although the initial stop was a misdemeanor, the officers' conduct was objectively reasonable because "[t]he record is also filled with incidents of felonious aggravated assault and felonious fleeing by the driver against the officers before any force was employed." (Defs.' Memo 10.) Whether such assaults occurred is disputed. The first alleged assault occurred as the officers pursued the Rickard vehicle on I-40. (See Defs.' SOF ¶ 47.) The second occurred when the Rickard vehicle changed from one lane to another and allegedly attempted to run an officer off the road. (See Deposition of Forthman at 107.) No contact was made

21

between the Rickard vehicle and any of the police vehicles while they were on I-40. Although the Rickard vehicle and the officers were engaging in a high-speed chase, the video of the pursuit does not show any assaults, but only the Rickard vehicle changing lanes. It is difficult to determine the exact proximity of the vehicles during the chase. The objective evidence here, the videos of the chase, would not support a reasonable person in concluding that there were aggravated assaults. Therefore, the officers' conduct was not objectively reasonable, even from the officers' perspective. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (stating that, on a motion for summary judgment, the court may view the facts in the light depicted by videotapes). The alleged aggravated assaults cannot serve as the foundation for finding that the officers' actions were objectively reasonable, and, thus, for concluding that no constitutional violation occurred.

The Separate Defendants also argue that Rickard's attempt to exit I-40 quickly; his swerving in traffic while traveling at a high speed; his disregard for the safety of others, including civilians; and his "intentional ramming of two different police vehicles" could lead a reasonable officer to think Rickard was an immediate threat, thus making their conduct objectively reasonable. (See Defs.' Memo 11-12.) The first three actions the Separate Defendants cite were caused by the pursuit of the

22

Rickard vehicle. The video images of the pursuit could lead to the conclusion that the officers also engaged in dangerous behavior by exiting I-40, swerving through traffic at high speeds, and compromising the safety of civilians. All of those factors would support an argument that the pursuit should have been terminated. However, dangerous conduct that was solely the product of engaging in a high-speed chase cannot serve as the foundation for deadly force. If those factors alone justified deadly force, deadly force would be constitutionally reasonable whenever officers engaged in a high-speed pursuit. The Supreme Court has held that this is not so. See Garner, 471 U.S. at 9-11.

Although it must give deference to the officers on the scene, see Williams, 496 F.3d at 486, when ruling on a motion for summary judgment, a court may adopt the version of facts told by a videotape of the incident. Scott, 550 U.S. at 380-81. The videotape here shows only that the vehicles were changing lanes and swerving through traffic. Based on that evidence, the Court must concludes that the officers' perception that they were the victims of assault was not objectively reasonable. The severity of the crime at issue, a misdemeanor, was low. The only objectively reasonable threat that Rickard posed was the threat that the officers also posed by participating in the pursuit.

The Separate Defendants also argue that Rickard posed an immediate threat because he intentionally rammed two police vehicles in Memphis. (See Defs.' Memo 12.) Whether the Rickard vehicle intentionally collided with the vehicles or collided with the Plumhoff vehicle as a result of momentum from an unintentional collision with the Evans vehicle is a disputed issue of material fact. As such, it cannot serve as the foundation for concluding that the officers' conduct was objectively reasonable. See Marvin, 509 F.3d at 244 (stating that, in determining whether officers' conduct violated a constitutional right, the court views the evidence in the light most favorable to the party asserting the injury).

Finally, the Separate Defendants argue that the officers' conduct was objectively reasonable because Rickard actively resisted arrest by affirmatively dangerous conduct and flight. (See Defs.' Memo 12.) Rickard did resist arrest, but it is not clear that his evasion of arrest was sufficiently dangerous to justify deadly force. Although the Court must give deference to the split second decisions of the officers, it must analyze the factors as a reasonable officer at the scene would have perceived the events. In Smith v. Cupp, an officer shot a fleeing suspect, asserting that he fired because the suspect's vehicle "was bearing down on them." 430 F.3d 766, 770 (6th Cir. 2005). The officer in Smith claimed that the suspect "rapidly

24

accelerated directly at [him] and [another officer]" and
"fearing for his life," he "drew his gun and fired four times in
rapid succession at [the suspect]." Id. (first alteration in
original). Although the officer conceded after the fact that he
had fired while the car was passing him, he asserted that he did
so as he jumped out of the way of the vehicle. Id. The Sixth
Circuit in Smith found that "[e]ven viewing the events in the
heat of the moment, without 20/20 hindsight, a jury could
conclude that a reasonable officer in [the officer's] position
was never in any danger." Id. at 774. The court went on to
acknowledge the deference that is given to an officer's decision
to shoot an unarmed suspect in a chase, but reiterated that the
officer must have a reasonable belief that the suspect presents
an imminent danger. See id. Based on that analysis, the court
affirmed the district court's denial of qualified immunity. Id.
at 777.

    In the instant suit, a reasonable jury could determine that
the belief that danger was imminent was not reasonable. Thus,
granting summary judgment based on the absence of a
constitutional violation would be inappropriate. See id. at 775
(finding constitutional violation in a qualified immunity
analysis where a "jury would . . . be entitled to determine that
[officer's] use of force was unreasonable and accordingly
unconstitutional.") The vehicle was fleeing as shots were

25

fired.   Although the Separate Defendants contend that the car
was "revving" when the first shots were fired, that is a
disputed issue.   The vehicle then turned, and it is undisputed
that it was headed away from all of the officers when the final
twelve shots were fired.   No officers or civilians were in front
of the vehicle as it was fleeing, the fleeing suspects were not
armed, and the officers had no reason to believe that the
suspects were violent or would continue to pose a threat if they
were not apprehended.   Compare id. (finding that that a jury
could determine that no reasonable officer would perceive that
there was an imminent danger), with Scott v. Clay Cnty., Tenn.,
205 F.3d 867, 872, 878 (6th Cir. 2000) (finding that deadly
force was reasonable as a matter of law against an unarmed
fleeing suspect where, after leaping out of the car's path, the
officer fired on the fleeing car as it turned directly toward
another police cruiser), and Smith v. Freland, 954 F.2d 343, 347
(6th Cir. 1992) (finding that deadly force was not unreasonable
as a matter of law where suspect had attempted to ram a cruiser,
was cornered, sped forward, and crashed into a police cruiser
that was blocking his escape, and was speeding up a street
toward a roadblock manned by other officers); see generally
Adams v. Speers, 473 F.3d 989, 993 (9th Cir. 2007)
(distinguishing case from others where qualified immunity was
granted when, taking plaintiffs' facts as true, there was a lack

26

of danger to the shooter and others and an absence of warning from the shooting officer); Vaughan v. Cox, 343 F.3d 1323, 1327, 1330 (11th Cir. 2003) (finding that district court erred in granting officer qualified immunity where officer contended that he fired during a pursuit because the suspect swerved as if to smash into his cruiser because a reasonable jury could find that fleeing suspect did not present an immediate threat). Therefore, the officers' use of deadly force was not objectively reasonable and a constitutional violation has occurred. See Smith, 430 F.3d at 775; see also Sigley v. City of Parma Heights, 437 F.3d 527, 536 (6th Cir. 2006) (citations omitted) ("[W]here there are contentious factual disputes relating to the reasonableness of an officer's use of deadly force, the court is precluded from granting summary judgment for [the] officers . . . ." (citation omitted)).

### b. Right Clearly Established

After determining that the facts, taken in the light most favorable to the Rickard Plaintiff, establish a constitutional violation, the Court must determine whether, in the specific context of this case, Rickard's right to be free from excessive force was "clearly established." See Marvin, 509 F.3d at 244; see also Dunn, 549 F.3d at 352-53. Thus, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Floyd v. City of Detroit, 518 F.3d 398, 407 (6th Cir. 2008) (citation omitted). Although Rickard's right to be free from excessive force is clearly established, the relevant question is whether the officers' perceptions were reasonable in determining that Rickard posed a threat sufficient to justify deadly force.

To support their argument that the right was not clearly established, the Separate Defendants cite Brosseau, in which the Supreme Court states that no court has found a Fourth Amendment violation where a police officer "shot a fleeing suspect who presented a risk to others." 543 U.S. at 198 (citations omitted). However, the court in Smith addresses the opposite situation, where a fleeing suspect poses no immediate threat, and holds, "[i]t is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon in the back of the head." Smith, 430 F.3d at 775-76. As discussed above, the facts here do not support a finding that a reasonable officer would have considered the fleeing suspects a clear risk to others. Therefore, Rickard's right to be free of excessive force was clearly established and the officers are not entitled to qualified immunity as a matter of law on the Rickard Plaintiff's § 1983 claims.

## 2. Allen Plaintiffs

The Allen Plaintiffs' Amended Complaint alleges violations of Kelly Allen's rights under the Fourth, Fifth, Sixth, and

Fourteenth Amendments.   The Fifth Amendment applies only to actions of the federal government, and, thus, does not apply here.   See Scott, 205 F.3d at 873 n.8.   The Sixth Amendment right to a speedy and public trial is inapplicable on its face. Therefore, the Court need only address the Allen Plaintiffs' Fourth and Fourteenth Amendment claims.   In determining whether to analyze the Allen Plaintiffs' claims under the Fourth Amendment, the issue is whether Allen was seized by the West Memphis Police Officers.   A passenger or "innocent passerby" is not "seized" under the Fourth Amendment.   A Fourth Amendment seizure occurs only "through means intentionally applied." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 844 (1998) (citation omitted).   The Fourth Amendment does not apply to passengers or other innocent third parties because "the authorities [cannot] 'seize' any person other than one who was a deliberate object of their exertion of force." Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir. 2000) (citation omitted).   Constitutional claims asserted by "persons collaterally injured" should be analyzed pursuant to "substantive due process norms." Id. (citation omitted).   Therefore, the Allen Plaintiffs' Fourth, Fifth and Sixth Amendment claims are dismissed, and the Court will analyze the Allen Plaintiffs' claims under the Fourteenth Amendment.

Separate Defendants assert that they are entitled to qualified immunity on this claim and that their motion for

summary judgment should be granted. As discussed above, the first step in a qualified immunity analysis is whether a constitutional violation has occurred. See Floyd, 518 F.3d at 404; Marvin, 509 F.3d at 244. The test for a Fourteenth Amendment violation is whether the alleged actions "shock the conscience" and violate the "decencies of civilized conduct." Lewis, 523 U.S. at 846 (citations omitted). Substantive due process is violated by government action only when that action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. at 847 (citation omitted). The Court in Lewis determined that in a high-speed chase, with "unforeseen circumstances demand[ing] an officer's instant judgment," the shocks-the-conscience analysis should be controlled by a malicious standard of proof, as opposed to a more relaxed "deliberate indifference" standard. Id. at 853-54. Because the officers in the instant suit were similarly engaged in a high-speed chase, where the initial collision and subsequent injuries occurred within a matter of seconds, the malicious standard of proof as applied and discussed in Lewis is the appropriate standard. Id. at 855; see also Claybrook, 199 F.3d at 360 ("[T]he 'malicious or sadistic' test of conscience-shocking behavior controls . . . because . . . [the officers] had no opportunity to ponder or debate their reaction to the

dangerous actions of the armed man.") That standard is articulated in Claybrook:

> [I]n a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."

Claybrook, 199 F.3d at 359 (quoting Lewis, 523 U.S. at 853).

In applying the Claybrook standard, the most difficult cases are those where "executive action is worse than negligent but was not done for the purpose of injuring someone or in furtherance of invidious discrimination." See Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 536 (6th Cir. 2008). In this middle ground, factors to consider in determining whether activity should be considered arbitrary are: (1) the voluntariness of the relationship between the government and the injured party; (2) whether the government actor was required to act in haste without deliberation; and (3) whether the government actor acted in pursuit of a legitimate governmental purpose. Id. In applying those factors, the court in Hunt noted that "as a general rule . . . where some countervailing, mandatory governmental duty motivated [the] action, the action will not shock the conscience." Id. at 543. Only in "extreme cases [will] the governmental actor's choice to

endanger a plaintiff in the service of a countervailing duty . .
. be deemed arbitrary." Id.; see also Jones v. Byrnes, 585 F.3d
971, 978 (6th Cir. 2009) ("[A]lthough Lewis established in 1998
that an officer's conduct in a police chase could theoretically
shock the conscience, there have been no examples of what
specific kinds of conduct rise to that level.").

The instant case is not such a case.  There is no evidence
that the officers' actions were malicious or sadistic.  The
officers who shot Allen were pursuing a legitimate governmental
objective – stopping a fleeing suspect – and as part of that
objective shot and killed Allen.  Regardless of whether the
officers made the correct decision in pursuing the fleeing
suspect, their behavior does not meet the exacting standard
applicable here.  It does not shock the conscience, establish
that the officers' actions were arbitrary, or that their actions
were the result of malice or sadism.[5] See Lewis, 523 U.S. at 855
(finding that an officer's behavior did not shock the conscience
and noting that "[w]hile prudence would have repressed the
reaction, the officer's instinct was to do his job as a law
enforcement officer, not to induce [the fleeing suspect's]
lawlessness, or to terrorize, cause harm, or kill."); Claybrook,

---

[5]  In their Response to Separate Defendants' Motion, the Allen Plaintiffs
recite the Model Penal Code's definition of recklessness. (Allen Pls.' Resp.
13.)   They do not address whether the officers' conduct "shocks the
conscience" or make any argument in favor of finding the officers' activity
arbitrary.

199 F.3d at 360 ("[E]ven if, as the plaintiffs have argued, the actions of the three defendant patrolmen violated departmental policy or were otherwise negligent, no rational fact finder could conclude, even after considering the evidence in the light most favorable to [plaintiff], that . . . [defendants] acted with conscience-shocking malice or sadism towards the unintended shooting victim."). The Allen Plaintiffs have not established behavior that meets the high standard necessary to shock the conscience. Therefore, they have not established a constitutional violation under the Fourteenth Amendment. Because the Court has not found the violation of a constitutional right, it need not determine whether the right was clearly established and whether Separate Defendants are entitled to qualified immunity. See Floyd, 518 F.3d at 404 (citation omitted); Marvin, 509 F.3d at 244. Separate Defendants' Motion for Summary Judgment on the Allen Plaintiffs' Fourteenth Amendment claims is GRANTED.

### B. Section 1983 Claims Against Chief Paudert

The Separate Defendants move to dismiss the § 1983 claims against Chief Paudert. Plaintiffs argue that Separate Defendants' Motion is premature. The Rickard Plaintiff asserts that the November 30, 2009 deadline was the deadline for Separate Defendants' dispositive motions dealing with qualified immunity only and that it would be premature to decide any

claims beyond immunity. (Rickard Pl.'s Resp. 3.) To the extent Separate Defendants seek additional relief, all Plaintiffs assert that the Motion is premature. Only two parties, Forthman and Plumhoff, have given depositions; there is much discovery to conduct; and the deadline for seeking dispositive relief other than qualified immunity has yet to pass. (Id. at 4; Allen Pls.' Resp. 14.) Specifically, Plaintiffs request that the Court refrain from addressing the claims against Chief Paudert until the parties take his deposition.

Plaintiffs' argument is not well-taken. The motion to dismiss was timely under the October 7, 2009 Scheduling Order, which set September 30, 2010 as the deadline for filing dispositive motions. (Rule 16(b) Scheduling Order, Dkt. No. 51, at 2.) "The Federal Rules of Civil Procedure allow for a Rule 12(b)(6) or a Rule 56 motion to be made at any time. Formal discovery need not have occurred." Metro. Life Ins. Co. v. Biggs, 68 F. App'x 644, 645 (6th Cir. 2003) (per curiam). Therefore, the motion to dismiss is not premature.

To state a § 1983 claim against an individual, a plaintiff must allege that the individual was personally involved in the alleged unconstitutional conduct. See Grinter v. Knight, 532 F.3d 567, 575 (6th Cir. 2008). In their Amended Complaints, Plaintiffs do not assert any personal involvement by Paudert beyond his supervisory responsibilities and his alleged public

34

showing of support for the officers' actions after the shooting. Those allegations are insufficient to state a claim. There is no allegation that Paudert encouraged or approved the officers' conduct before it occurred or directly participated in their conduct. See Cardinal v. Metrish, 564 F.3d 794, 802-03 (6th Cir. 2009) ("We have held that, even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.' 'At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'") (citations omitted); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) ("[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'") (citation omitted); Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988) (stating that, where the plaintiff alleged that supervisors were aware of sexual harassment but did not take appropriate action, the plaintiff's allegations were insufficient to impose liability on the supervisors under § 1983). Therefore, the § 1983 claims brought against Paudert in his individual capacity are DISMISSED. See Iqbal, 129 S. Ct. at 1949.

35

### C. State Law Claims

Tennessee law applies to Plaintiffs' state law claims. Therefore, the Court need not address the Separate Defendants' arguments about immunity under Arkansas law, Ark. Code Ann. § 21-9-201; immunity from liability to felons under Arkansas Code Annotated § 16-120-301; and Plaintiffs' claims pursuant to the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-105(a).  The Arkansas claims are DISMISSED.  See Derthick Assocs., Inc. v. Bassett-Walker, Inc., Nos. 95-2230, 95-2231, 95-2232, 1997 WL 56908, at *4 (4th Cir. Feb. 12, 1997) (affirming district court's dismissal of claims under Massachusetts law where district court concluded that Virginia law governed the dispute); Elvig v. Nintendo of Am., Inc., 696 F. Supp. 2d 1207, 1215 (D. Colo. 2010) (dismissing claims under Washington law after finding that Colorado's choice-of-law rules require that Washington law not apply to plaintiffs' claims); cf. Paul v. Deloitte & Touche LLP, No. 06-225-MPT, 2007 WL 2402987, at *4 (D. Del. Aug. 20, 2007) (dismissing claim under Massachusetts law where the parties' contract required the application of Delaware law).

### 1. Immunity Under Tennessee law

The Separate Defendants assert that they are entitled to immunity for any allegations of false arrest, intentional infliction of emotional distress, and civil rights violations

36

pursuant to the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. §§ 29-20-101 et seq. (Defs.' Memo 41-42.) The TGTLA states:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
>
>     . . . .
>
> (2) false imprisonment pursuant to mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights.

Tenn. Code Ann. § 29-20-205. The TGTLA defines "employee" as "any official (whether elected or appointed), officer, employee or servant, or any member of any board, agency, or commission (whether compensated or not), or any officer, employee or servant thereof, of a governmental entity, including . . . police." Tenn. Code Ann. § 29-20-102(2). "Governmental entity" is defined as "any political subdivision of the state of Tennessee." Id. § 29-20-102(3)(A). Because none of the Separate Defendants is a governmental entity or an employee of a governmental entity, as defined by the TGTLA, the TGTLA does not provide Separate Defendants with immunity.

## 2. Felons Barred from Recovery

The Separate Defendants assert that they are entitled to absolute immunity from civil liability to the Rickard Plaintiff

37

because any injuries were inflicted on Rickard while he was perpetrating a felony. (Defs.' Memo 43.) Pursuant to Tennessee Code Annotated § 29-34-201, a person is granted absolute immunity from civil liability, even for inflicting death, if:

> (A) The person was preventing or attempting to prevent the perpetrator from committing the offense or was apprehending the perpetrator of the offense; and

> (B) The perpetrator was committing one (1) or more of the offenses specified in subdivision (c)(1)-(9) or was attempting to commit one (1) or more of the offenses specified in subdivision (c)(10).

Tenn. Code Ann. § 29-34-201(b)(1). The Separate Defendants assert that subdivisions (c)(1), "[a]ny criminal homicide," and (c)(10), "[a]ttempt to commit first or second degree murder" are relevant here and provide them with immunity. (Defs.' Memo 42-43 (citing Tenn. Code Ann. § 29-34-201(c)(1), (10)).) Whether Rickard is properly considered a felon under the circumstances is a disputed issue of material fact. More pertinently, Separate Defendants allege only that Rickard committed attempted assault, which is not among the listed offenses. See Tenn. Code Ann. § 29-34-201(c). Because they have not alleged that Rickard committed any of the offenses for which this section grants immunity, the Separate Defendants' Motion for absolute immunity pursuant to § 29-34-201 is DENIED.

### 3. Tennessee Constitutional Claims

Separate Defendants assert that Plaintiffs' claims under the Tennessee Constitution should be dismissed because there is no separate right of action under the Tennessee Constitution. (Defs.' Memo 44). Plaintiffs acknowledge that under Tennessee case law there is no private cause of action for violation of the Tennessee Constitution, but assert that the case law does not address the particular fact pattern presented here and does not account for the 1998 addition of Article I, Section 35 to the Tennessee Constitution. (Rickard Pl.'s Resp. 37.)[6]

Tennessee case law is clear: Tennessee does not recognize a private right of action for violation of the Tennessee Constitution. See Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999); see also Cline v. Rogers, 87 F.3d 176, 179 (6th Cir. 1996); Lee v. Ladd, 834 S.W.2d 323, 325 (Tenn. Ct. App. 1992), appeal denied (Tenn. 1992). The Court cannot alter this clearly established rule based on the particular facts of this case. Plaintiffs argue that the rationale in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), where the

---

[6] Article I, Section 35 of the Tennessee Constitution states, in pertinent part:

> To preserve and protect the rights of victims of crime to justice and due process, victims shall be entitled to the following basic rights:
> . . . .
> (2) The right to be free from intimidation, harassment and abuse throughout the criminal justice system;
> . . . .
> (7) The right to restitution from the offender.

Supreme Court implied a cause of action for damages against federal officials who violated the Fourth Amendment, should extend to the Tennessee Constitution. (Rickard Pl.'s Resp. 40.) However, in Lee, the Tennessee Court of Appeals stated, "[s]o far as we are able to determine, the Tennessee courts have not extended the rationale of Bivens to give a state cause of action against a police officer for violating a person's civil rights." Lee, 834 S.W.2d at 325. Plaintiffs have cited no Tennessee case law contradicting this statement and extending the Bivens rationale to the Tennessee Constitution.

The adoption of Article I, Section 35 does not lead to a contrary conclusion. Since its adoption, Tennessee courts have continued to hold that Tennessee does not recognize a private right of action for violation of the Tennessee Constitution. See, e.g., Crowe v. Bradley Equip. Rentals & Sales, Inc., No. E2008-02744-COA-R3-CV, 2010 WL 1241550, at *8 (Tenn. Ct. App. Mar. 31, 2010) (stating in 2010 that the plaintiff "fails to demonstrate that the General Assembly has created a private cause of action for violations of the Tennessee Constitution, and we know of no authority that recognizes a private cause of action for such violations") (citations omitted); Bowden Bldg. Corp., 15 S.W.3d at 446 (stating in 1999 that "Tennessee, however, has not recognized any such implied cause of action for damages based upon violations of the Tennessee Constitution")

(citations omitted).   Therefore, Separate Defendants' Motion to
Dismiss the claims arising under the Tennessee Constitution is
GRANTED.

### 4. Malicious Harassment

Plaintiffs have asserted claims of malicious harassment
pursuant to Tennessee Code Annotated § 4-21-701.  This Court has
previously ruled that a malicious harassment claim "must be
related to the victim's race, color, ancestry, religion or
national origin."  <u>Order Denying Plaintiffs' Motion to Certify
Question to the Supreme Court</u>, Dkt. No. 32, at 5 (Nov. 13,
2006).   Nevertheless, the Rickard Plaintiff argues that the
Court should not rule on this issue until the Western Section of
the Tennessee Court of Appeals rules in <u>Bowman v. City of
Memphis</u>, No. W2009-00084-COA-R3-CV.  (Rickard Pl.'s 40.)   In a
January 27, 2010 Opinion, the Tennessee Court of Appeals
reaffirmed that a plaintiff must demonstrate conduct motivated
by race, color, religion, ancestry, or national origin to state
a claim of malicious harassment. <u>Bowman v. City of Memphis</u>, No.
W2009-00084-COA-R3-CV, 2010 WL 322632, at *3 (Tenn. Ct. App.
Jan. 27, 2010).  Neither the Rickard Plaintiff nor the Allen
Plaintiffs allege that any of the actions of the West Memphis
Police Officers were motivated by race, color, ancestry,
religion, or national origin.   Therefore, the malicious
harassment claims are DISMISSED.

### 5. Assault and Battery

Tennessee common law defines assault as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against that person." Thompson v. Williamson Cnty., 965 F. Supp. 1026, 1037 (M.D. Tenn. 1997) (citation omitted). Battery in Tennessee requires a showing that a person committed a "conscious and volitional act" that was a harmful or offensive touching of another without privilege. See City of Mason v. Banks, 581 S.W.2d 621, 626 (Tenn. 1979).

The Separate Defendants move to dismiss the assault and battery claims against Paudert because he was not present during the events in question and because he was not personally involved in the pursuit. (Defs. Memo 34.) Plaintiffs' Amended Complaints do not allege that Chief Paudert was present. Therefore, they have not stated a claim of assault or battery against Chief Paudert and the claims of assault and battery against Paudert are DISMISSED.

The Separate Defendants also move to dismiss the assault claims as against all West Memphis Police Officers pursuant to Tennessee Code Annotated § 40-7-108, which states that a law enforcement officer has the right to use force reasonably necessary to apprehend a person resisting arrest. (Defs.' Memo

42

34.)   Separate Defendants argue that it was reasonable for the officers to use force to apprehend Rickard and Allen in light of the facts and circumstances.   (Id. at 34-35.)   Separate Defendants seek dismissal of the claims, but their argument, citing their statement of undisputed facts and requesting the Court to find the officers' actions objectively reasonable, is properly analyzed under a summary judgment standard.   For the reasons discussed above in Section IV.A.1, summary judgment should not be granted in the instant case based on a finding that the officers' actions were reasonable as a matter of law. Separate Defendants' Motion on the assault claims against the officers is DENIED.[7]

Defendants Ellis, Forthman, and Evans seek dismissal of the claims of battery against them because the Plaintiffs cannot show that these officers ever offensively touched Rickard or Allen.   (Defs.' Memo 35.)   In response, Plaintiffs argue that these arguments are premature because discovery is ongoing and they have yet to depose Ellis or Evans.   (Rickard Pl.'s Resp. 35.)   Because these Defendants do not cite to the record, the Court construes their request as a motion to dismiss based on the allegations in the Amended Complaints.   See Winget v. JP

---

[7] Granting Separate Defendants' Motion on these claims would also be improper under the language of Tennessee Code Annotated § 40-7-108, which states that an officer may use deadly force "only if all other reasonable means of apprehension have been exhausted or are unavailable" and "where feasible, the officer has . . . given a warning that deadly force may be used unless resistance or flight ceases." Tenn. Code Ann. § 40-7-108(b).

Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008). A plaintiff need not have completed discovery before a court decides a motion to dismiss. See Tucker v. Union of Needletrades, Indus. and Textile Emps., 407 F.3d 784, 787-88 (6th Cir. 2005). The allegations in the Amended Complaints do not plausibly suggest that Ellis, Forthman, or Evans intentionally inflicted harmful or offensive physical contact on Rickard or Allen. Therefore, Plaintiffs' battery claims against Ellis, Forthman, and Evans are DISMISSED. See Iqbal, 129 S. Ct. at 1949; Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009); Geeslin ex rel. Geeslin v. Bryant, No. 06-2768-STA, 2010 WL 2365329, at *4 (W.D. Tenn. June 9, 2010).

Defendants Plumhoff, Gardner, and Galtelli assert that the claims of assault and battery against each of them should be dismissed because each's actions were justifiably in self-defense and in defense of third parties. (Defs.' Memo 35.) These Defendants seek dismissal, but their argument and the facts submitted are properly analyzed under a summary judgment standard. The Separate Defendants argue that these three officers had a reasonable basis to believe that the Rickard vehicle posed a threat to their safety, and, thus, the claims of assault and battery cannot stand. (Defs.' Memo 35-36); see also Tenn. Code Ann. § 40-7-108. For the reasons discussed above in Section IV.A.1 and footnote 7, that argument cannot prevail.

Separate Defendants' Motion on the assault and battery claims against Plumhoff, Gardner, and Galtelli is DENIED.

### 6. Intentional Infliction of Emotional Distress and Outrage

Intentional inflicition of emotional distress ("IIED") and the tort of outrage are the same tort under Tennessee law. See Moorhead v. J.C. Penney Co., 555 S.W.2d 713, 717 (Tenn. 1977). To establish a claim of IIED under Tennessee law, a plaintiff must show that "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004) (citing Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)). To satisfy those elements, it is not enough to show that a defendant "has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress." Id. (citation and internal quotation marks omitted). Rather, a plaintiff must also show that defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation and internal quotation marks omitted).

The Separate Defendants argue that these claims should be dismissed because no facts are asserted to support a claim of IIED, but cite their statement of material facts in support of their argument. (Defs.' Memo 38.) Therefore, the Court regards the Separate Defendants' motion on this issue as one for summary judgment. Plaintiffs argue that these claims are premature and should not be addressed at this stage of the litigation. Plaintiffs have alleged facts sufficient to state a claim of IIED. At this stage, granting summary judgment in favor of the Separate Defendants would be improper. The Court DENIES Separate Defendants' Motion on the IIED claims without prejudice.

### 7. False Imprisonment and False Arrest

To bring a claim of false imprisonment under Tennessee law, a plaintiff must show: detention or restraint against his will and the unlawfulness of such detention or restraint. Coffee v. Peterbilt of Nashville, Inc., 795 S.W.2d 656, 659 (Tenn. 1990). False arrest and false imprisonment are separate torts under Tennessee law. "A false arrest is one means of committing a false imprisonment, but a distinction has been drawn between the two in that a false arrest must be committed under assumption of legal authority." Stubblefield v. Hawkins Cnty., No. 2:06-CV-129, 2007 WL 4365758, at *5 (E.D. Tenn. Dec. 11, 2007) (quoting 35 C.J.S. False Imprisonment § 2 (1960)). Where, as here, the

alleged false imprisonment arises out of the arrest of plaintiffs, the two torts are essentially the same.  Id.

Separate Defendants move to dismiss Plaintiffs' claims of false imprisonment and false arrest because the officers had probable cause to stop Donald Rickard.  (Defs.' Memo 40.) Because they cite to facts in the record beyond the pleadings, the Court construes their request as a motion for summary judgment.  See Hensley Mfg., 579 F.3d at 613.  At this stage, granting summary judgment in favor of the Separate Defendants would be improper.  The Court DENIES Separate Defendants' Motion on the false imprisonment and false arrest claims without prejudice.

### 8. Other Tennessee Claims

The Plaintiffs have alleged abuse of process under Tennessee law.  "An action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law." Priest v. Union Agency, 125 S.W.2d 142, 143 (Tenn. 1939).  Plaintiffs do not state an abuse of process claim here.  Therefore, Separate Defendants' Motion to Dismiss Plaintiffs' abuse of process claim is GRANTED.

Finally, the Separate Defendants argue that they are entitled to immunity on the wrongful death claims pursuant to the TGTLA.  Because the TGLTA provides Defendants with no immunity, they are not entitled to immunity.

**V.    Conclusion**

For the foregoing reasons, the Court GRANTS the Separate Defendants' Motion for Summary Judgment on the Allen Plaintiffs' Fourteenth Amendment claims, GRANTS the Separate Defendants' Motion to Dismiss the Allen Plaintiffs' Fourth, Fifth and Sixth Amendment claims, and GRANTS the Separate Defendants' Motion to Dismiss the § 1983 claims against Paudert in his individual capacity, the malicious harassment claims, the claims under the Tennessee Constitution, the assault and battery claims against Paudert, the battery claims against Ellis, Forthman, and Evans, and the abuse of process claims.  The Separate Defendants' Motion is DENIED as to all other claims.

So ordered this 19th day of January, 2011.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE